**Kramer and Associates**
Michael C. Kramer, ABA 9605031
542 4th Ave., Ste. 207
Fairbanks, Alaska 99701
Telephone: (907) 888-4098
Fax: (907) 264-6602

Attorney for Marvin Roberts.



RECEIVED

DEC 0 7 2017

CLERK, U.S. DISTRICT COURT
FAIRBANKS, AK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARVIN ROBERTS, ) | Case No: 4:17-cv-00034-HRH |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CITY OF FAIRBANKS, JAMES ) | |
| GEIER, CLIFFORD AARON RING, ) | |
| CHRIS NOLAN, DAVE KENDRICK, ) | |
| DOE OFFICERS 1-10, and DOE ) | |
| SUPERVISORS 1-10, ) | |
| ) | |
| Defendants. ) | |

### COMPLAINT AND JURY DEMAND
(Seeking relief under 42 U.S. § 1983)

### INTRODUCTION

1.    On October 11, 1997, Marvin Roberts – an Athabascan from the village

of Tanana, Alaska – was 19 years old. He had recently graduated as valedictorian of

his high school class and begun working as a wildland firefighter. He had just

returned from a successful moose hunt with his father. He was a young man with a

bright future. He spent the night dancing at a wedding reception at the Eagles Hall in Fairbanks.

2.      The same night, five other young men were driving around the streets of Fairbanks looking for Alaska Natives to beat up for fun. They almost caught an Alaska Native man in his 60s but he got away, so they attacked a 15-year-old white boy named John Hartman instead. They kicked and beat Hartman to death. They would brag about the crime repeatedly in the days and decades to come.

3.      Fairbanks police manufactured evidence to convict Marvin and three other men – known as the "Fairbanks Four" – of killing Hartman and assaulting a man named Franklin Dayton, despite the fact that eight witnesses established that Marvin was dancing at the reception at the time of the attacks. Marvin spent 18 years in prison for crimes he did not commit. On December 17, 2015, all charges against him were dismissed, and he was finally exonerated.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Marvin's rights as secured by the United States Constitution.

5.      This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

6.      Supplemental jurisdiction over Marvin's state law claims exists pursuant to 28 U.S.C. § 1367(a).

7.     Venue is proper because this is the district in which the claim arose.

## JURY DEMAND

8.     Plaintiff respectfully demands trial by jury on all issues in this case under Federal Rule of Civil Procedure 38(b).

## PARTIES

9.     Plaintiff Marvin Roberts is a citizen of the United States who resides in Fairbanks, Alaska.

10.    Defendant City of Fairbanks ("the City") is a Home Rule, First Class City, and Municipal Corporation organized under the laws of the State of Alaska. It employed the individual defendants. It is responsible for the policies, practices, and customs of the Fairbanks Police Department ("FPD").

11.    Defendant James Geier was a FPD Detective and Lieutenant during all times relevant to this complaint and is currently employed as a FPD Lieutenant. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

12.    Defendant Clifford Aaron Ring was a FPD Detective during all times relevant to this complaint. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

13.     Defendant Chris Nolan was a FPD Detective during all times relevant to this complaint. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

14.     Defendant Dave Kendrick was a FPD Sergeant during all times relevant to this complaint. He acted under color of law, within the scope of his employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. He is sued in his individual capacity.

15.     Defendants Doe FPD officers 1-10 cannot be named specifically because their identities are not yet known. They acted under color of law, within the scope of their employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. They are each sued in their individual capacity.

16.     Defendants Doe FPD supervisors 1-10 cannot be named specifically because their identities are not yet known. They acted under color of law, within the scope of their employment and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the FPD. They are each sued in their individual capacity.

## FACTS

## The murder of John Hartman

17.     William Holmes, Jason Wallace, Shelmar Johnson, Rashad Brown, and Marquez Pennington often drove around downtown Fairbanks at night and beat up Alaskan Natives for fun.

18.     On October 11, 1997, they saw Robert John, who was in his early 60s at the time and is Native Alaskan. They chased him and one of them attempted to kick him but he escaped into an alley.

19.     Unable to find any solitary Alaska Natives to attack, Holmes, Wallace, Johnson, Brown, and Pennington instead attacked 15-year-old John Hartman. They brutally beat and kicked him to death.

20.     They drove Holmes' mother's maroon 1992 Ford Tempo with license plate number CUF508 and serial number 1FAPP36X2NK216949 on the night of the murder.

21.     Another man named Franklin Dayton was also assaulted on the streets of Fairbanks on the same night.

22.     A day or two later Wallace bragged about murdering Hartman.

23.     Wallace admitted killing Hartman to at least three people.

24.     Wallace has committed additional murders after killing Hartman, including beating a woman to death with a hammer and stabbing a man to death with a screwdriver.

25.    Holmes has also committed additional murders after killing Hartman.

26.    If the FPD had pursued Holmes and Wallace for killing Hartman in 1997, their subsequent victims would still be alive.

## FPD framed Marvin for crimes he did not commit

27.    There was immense public interest in Hartman's murder, non-stop media coverage, and intense pressure on the City and FPD to arrest someone.

28.    All the defendants were aware of every development in this case for its entire, tortured history.

29.    James Hayes was the Mayor of Fairbanks when Hartman was murdered. Prior to Marvin's conviction, Hayes stated in the press that convicting the Fairbanks Four was so important that he had changed earlier plans to cut the FPD's budget.

30.    Hartman was white.

31.    The FPD intentionally convicted Marvin, Eugene Vent, George Frese, and Kevin Pease – the "Fairbanks Four" – for murdering Hartman and assaulting Dayton knowing they were innocent.

32.    Pease is Native American, and the rest of the Fairbanks Four are Native Alaskan.

33.    The Fairbanks Four were targeted by the FPD based on racial animus.

34.    During the time when Hartman was being murdered and Dayton was being assaulted, Marvin was dancing at a wedding reception at the Eagles Hall.

35.     Eight witnesses including several of his dance partners placed Marvin at the wedding reception during the relevant time period.

36.     FPD Detective Ring conducted much of the investigation that led to Marvin's wrongful conviction.

37.     Ring admitted that he had no evidence indicating Marvin and the rest of the Fairbanks Four were guilty when he decided to focus the investigation on them.

38.     Arlo Olson was drinking and smoking marijuana at the same wedding reception where Marvin was dancing on the night of the attack.

39.     Ring requested that Olson come to the FPD station for an interview two days after the crime, but Olson refused.

40.     For the following week, Ring and Kendrick and Doe defendants repeatedly came by Olson's grandfather's apartment looking for Olson.

41.     Kendrick eventually transported Olson to the FPD station to be interviewed.

42.     Olson reasonably believed he was in custody and that he was not free to leave the interrogation.

43.     Ring and/or Doe defendants interrogated Olson for two hours at FPD headquarters before beginning to record the interview.

44.     Olson truthfully told the police that while he was standing outside the Eagles Hall, he had seen a beige car and a scuffle but could not identify anyone involved.

45.     Ring and/or Doe defendants had already decided that the Fairbanks Four had committed the crime while driving Marvin's blue, two-door, Dodge Shadow hatchback.

46.     Ring and/or Doe defendants explained their theory of the case to Olson and coerced him to testify consistent with their version of events.

47.     FPD supplied Olson with confidential details including the identity of the men the FPD wanted Olson to identify – Marvin and the rest of the Fairbanks Four – and that Marvin drove a blue car that had two doors.

48.     Only after successfully pressuring Olson into changing his testimony did the officer(s) begin to record the interrogation.

49.     As a direct result of the coercion by the FPD officer(s), Olson changed his testimony to state that he had been standing outside the wedding reception when Marvin and the rest of the Fairbanks Four pulled up in a blue, two-door car and asked Olson if he wanted to get high.

50.     Olson stated that about half an hour after he first spoke with them, he saw the Fairbanks Four assault Dayton and leave in the same car.

51.     After leaving the coercive interrogation, Olson again told the truth – that he could not identify who had attacked Dayton and did not want to testify at trial.

52.     Ring again threatened Olson and was again successful in suppressing the truth.

53.     At trial, Olson was the only witness to state that Marvin had participated in the attack on Dayton.

54. There were no witnesses placing Marvin at the scene of Hartman's murder.

55. Olson's testimony was crucial in securing Marvin's wrongful conviction.

56. Olson eventually swore an affidavit admitting that his testimony was false.

57. Olson apologized to the Fairbanks Four and they forgave him.

58. Olson committed suicide in 2017.

59. Ring and other FPD officers violated basic investigative procedure by refusing to consider other suspects and using interrogation techniques that are known to yield false confessions.

60. Ring, Geier, Kendrick and/or Doe defendants conducted similarly coercive interviews of Marvin's co-defendants.

61. Co-defendants George Frese and Eugene Vent were intoxicated and sleep-deprived when interrogated on the night of the attacks.

62. Ring and/or Kendrick and/or Doe defendants intentionally failed to record potions of Vent's interview because they were supplying Vent with details that were not public knowledge and Ring was coercing Vent to make a confession.

63. As a result of the coercive interrogation tactics, FPD was successful in coercing Frese and Vent to make false confessions, which they soon recanted.

64. Marvin never made any confession at any time and has always maintained his innocence.

65.    Ring, Geier and/or Doe defendants threatened and harassed other witnesses in the case including Shara David, Dana Andon, and Shawna Goebel.

66.    Conan Goebel told Doe defendants he was with the Fairbanks Four, and they could not have committed the murder, but Doe defendants threatened to arrest him and pressured him to change his story.

67.    Chris Stone was with Hartman shortly before Hartman was killed and was interviewed by police, but that interview was concealed from the Fairbanks Four.

68.    Stone's interview would have led to alternate suspects.

69.    Geier and/or Ring and/or Doe defendants intentionally withheld evidence that implicated alternative suspects, including the statements made by Goebel and Stone.

70.    Extensive forensic evidence was collected and analyzed by Kendrick and Doe defendants, including DNA from the crime scene, fingerprints, and scrapings from the victim's fingernails. None of it connected the Fairbanks Four to the attacks.

71.    Deputy state medical examiner Franc Fallico testified to Hartman's cause of death and also stated that boot marks on Hartman's face matched the boots worn by George Frese, another one of the Fairbanks Four.

72.    Fallico had no training on how to conduct shoe mark identification and was not qualified to testify on that subject at Marvin's trial.

73. Footwear expert Lesley Hammer re-examined Fallico's conclusions and found that his testimony was false and without scientific basis.

74. Fallico failed to use even the most basic principles, equipment, techniques, and procedures that are necessary to provide an accurate footwear analysis.

75. Specific examples include his failure to compare the marks on the right or left side of the victim's head to the outsole of the of the boot, failure to examine all the available evidence, failure to create test impressions, misunderstanding of or disregard for the type of scale used, failure to use the correct methods of comparison, and failure to take into account damage and wear on the boots.

76. Kendrick was involved in examining the marks on Hartman's face and compiling comparisons between those marks and Frese's boots that were later relied on by Fallico.

77. Kendrick and Ring manufactured a deceptive trial exhibit of the boot print overlaid on a photo of Hartman's face.

78. The manufactured evidence, especially Olson's false testimony, caused Marvin to be convicted for murdering Hartman and assaulting Dayton.

79. The FPD arrested Marvin only two days after the assault and indicted him only two days after his arrest.

80. Current Alaska Attorney General Jahna Lindemuth, when she was in private practice, was one of the attorneys that fought to free Marvin after his wrongful conviction.

81.    Ms. Lindemuth has stated of the case that "[a]t a minimum you can say it was a rush to judgment."

82.    Marvin was convicted of murder, robbery, and assault for crimes he did not commit. He was sentenced to 33 years in prison.

## The conspiracy to prevent Marvin's exoneration

83.    In 2008, Scott Davidson, who was a friend of the true murderer Wallace, told Doe defendants that Wallace had admitted to killing Hartman.

84.    Doe defendants concealed Davidson's statement and did not disclose it to Marvin.

85.    If the FPD had disclosed Davidson's statement to Marvin in 2008, Marvin would have been exonerated seven years earlier.

86.    In 2011, Holmes admitted killing Hartman, and his admission was sent to the FPD.

87.    Doe defendants assigned FPD Detective Chris Nolan to follow up on Holmes' 2011 confession.

88.    Nolan took no action for four years.

89.    FPD never shared Holmes' 2011 confession with Marvin.

90.    Marvin eventually learned of Holmes' confession from a different source, and it is the single most crucial piece of evidence that eventually led to his exoneration.

91.     After Marvin filed the petition for post conviction relief ("PCR") that would ultimately exonerate him, Nolan notified Geier of Holmes' 2011 confession.

92.     The Alaska State Troopers, including Randy McPherron, investigated the Hartman murder after learning of Holmes' confession in 2011. At the evidentiary hearing on the PCR, McPherron testified that the Trooper investigation was unable to find any evidence placing Marvin at the scene of the crime and was generally critical of the FPD investigation.

93.     If the FPD had disclosed Holmes' 2011 confession to Marvin, Marvin would have been exonerated four years earlier.

94.     Marvin submitted a public information request to the City in 2013 for evidence that would assist him in showing that Fallico's testimony regarding the boot marks was false.

95.     The City denied Marvin's request and also denied his appeal of its original denial.

96.     The evidence Marvin sought from the City was exculpatory, and the City intentionally withheld it to prevent Marvin from being exonerated.

97.     In 2014, Takory Stern, who was living at the Alaska Motor Inn in downtown Fairbanks on the night Hartman was murdered, asked to speak with FPD and gave them information that corroborated that Wallace, Holmes, Johnson, Brown, and Pennington killed Hartman.

98.     FPD knew that Wallace had admitted to the murder when they interviewed Stern, but they only recorded a small portion of Stern's interview and did not disclose Stern's statement to Marvin.

99.     If the FPD had honored Marvin's public information request and disclosed Stern's statement to Marvin, he would have been exonerated sooner.

### Marvin is forced to sign a release dismissal agreement

100.    Marvin is innocent.

101.    Marvin was paroled after serving 18 years, which was the entire active portion of his sentence.

102.    After he was released from prison but while he was still on parole supervision, it became clear that his PCR would be successful, and he would soon be vindicated.

103.    Judge Lyle, the Alaska Superior Court Judge assigned to the PCR, had estimated it would take six to eight months to reach a decision.

104.    Judge Lyle stated that if he ruled in favor of the Fairbanks Four, it might be necessary to retry the case.

105.    As a result of the horrific misconduct that became exposed through the litigation of Marvin's PCR, the State of Alaska offered to dismiss Marvin's conviction and free the other three members of the Fairbanks Four in exchange for Marvin signing a release dismissal agreement giving up his right to pursue damages.

106. Marvin was already out of custody and confident that he would soon be exonerated by the PCR, so he had no interest in signing the release dismissal agreement.

107. The State told Marvin that the other three men would only be released to share Christmas with their families only if he signed the agreement.

108. The release prepared by the State included the City and its employees as released parties despite the fact that the City was not a party to the PCR and the State has the sole authority to dismiss the charges.

109. The State forced Marvin to sign the release dismissal agreement by stating it would not release the other three innocent men from prison, regardless of what they agreed to sign, unless Marvin also relinquished his claims for compensation for 18 years of wrongful imprisonment.

110. Marvin was confident that the PCR would eventually exonerate them but could not take any chances with the freedom of three innocent men.

111. Even assuming Judge Lyle did rule in their favor, that ruling would not come for six to eight months and could result in appeals and new trials, which could take years.

112. Marvin was placed in the untenable position of either waiting for Judge Lyle's decision and inevitable appeal while his innocent friends rotted in jail **or** signing away a valuable right so that three innocent men held captive in steel cages for 18 years would be released.

113.    The bargaining position of the parties to the release dismissal agreement was so exceedingly unbalanced that Marvin had no choice but to sign.

114.    Marvin's signature on the release dismissal agreement was as coerced and involuntary as someone paying a ransom to a kidnapper.

115.    Marvin received no benefit from signing the agreement because he had already served the entire active term of his sentence.

116.    The facts of this case are so egregious and so well documented that it was impossible for the State to believe that Marvin's civil claim was frivolous when it forced him to sign the release dismissal agreement.

117.    The State negotiated the release dismissal agreement for the purpose of preventing civil claims that it knew were valid.

118.    The defendants cannot meet their burden of proving that the release dismissal agreement should be enforced.

119.    It is not good public policy to coerce a citizen to give up something valuable in exchange for vacating wrongful convictions and releasing innocent men from prison.

120.    Public policy demands that Marvin finally get his day in court for his own sake and for the monumental importance of this case to the Native Alaskan community as a whole.

121.    The release dismissal agreement violates public policy and cannot be enforced such as to allow the defendants to avoid any accountability.

122.    Marvin's wrongful conviction may have started in 1997, but it was perpetuated through 2015, and the defendants will continue to operate in the same manner in other cases unless Marvin is allowed to exercise his constitutional right to access the court.

123.    After Marvin was exonerated, the City launched an investigation into FPD misconduct surrounding his conviction and created a new diversity committee, calling the Fairbanks Four case "a black eye for the department."

124.    FPD Chief Randall Aragon stated that it no longer mattered whether the Fairbanks Four were innocent because they had been "turned loose."

## Background of corruption and constitutional violations.

125.    The facts of Marvin's case must be considered in the light of the FPD's rampant corruption and long history of racially motivated persecution of Alaska Natives.

126.    11.74% of the residents of Fairbanks are Native Alaskan.

127.    44.36% of the inmates of the Fairbanks Correctional Center are Native Alaskan as of 2014, the last date for which data is available.

128.    The FPD does not currently have any Native Alaskan officers and did not have any in 1997 when it was prosecuting Marvin.

129.    Mike Pulice was the head of the department of public safety (police chief) for the City.

130.  On or before January 2, 1996, Pulice was advised that guns, drugs, and over $500,000 in cash had been stolen from the FPD evidence room and were never recovered.

131.  Pulice withheld this information from Mayor James Hayes for over a month.

132.  Pulice was later implicated in the thefts, but no one was ever charged, and the missing guns, cocaine, and cash were never recovered.

133.  The thefts from the evidence room compromised ongoing criminal cases.

134.  The City Council and Mayor were made aware of the extent of the scandal and the evidence implicating Pulice in it. However, rather than address this most serious type of corruption, they made a conscious decision to sweep the scandal under the rug. They failed to fully investigate and imposed no serious consequences on Pulice. Their actions made clear that public perception of the FPD was their top priority, and they sent a message to the rest of the police force that rule breaking is tolerated.

135.  Council member Wolting said this about the FPD on December 2, 1996: "that department [FPD] had been run amuck for quite some time. A lot of it never surfaced, and this goes way back to a lot of the chiefs that were in there. Some of them were promoted from the ranks and became what I would call a weak chief of police, and that can go back many years. And that sort of followed a trend. And I know from the heat that I took publicly and everything else, because I was

COMPLAINT AND JURY DEMAND
*Roberts v. City of Fairbanks, et al.*
Page 18 of 35

going to hire a man, another man, come highly recommended back east, and Mr. Mayor, you probably remember that. The press got a hold of it, raised hell with it. Finally had to call Herb. We had to call the man tell him, no, he wasn't hired. And one of his greatest qualities was, he was known as a hit cleanup man. He went into departments that had trouble, and rotten departments, and that was in a sense his specialty. He would come in and he cleaned out departments. And this community would not let that man in here, and that was a human cry out here across the City. So then I turned internally, and there was Mike [Pulice]."

136.　　During discussion by the council over what to do about Pulice's handling of the evidence room thefts on December 2, 1996, Council member Allen stated, "I guess the way I approach this, the issue of punishing Mike is secondary almost to how are we going to rebuild public confidence and trust (indiscernible). That to me is primary. If you can give me a plan that Mike takes two weeks off and gets a letter of reprimand, and we have trust and confidence back in the police force, you know, that's great. To me that's -- right now that's the primary issue. That's the issue. I mean, what happens to Mike -- we're talking about an institution that is very important to the City of Fairbanks, and Mike, like all managers, has done good and has done bad, whatever; employee problems and whatever. But to me the issue isn't punishing one person if that doesn't bring back the trust and confidence in the police force. That is the issue, and I don't have a (indiscernible). I don't know. But to me that's the issue."

137.    Council member Whitaker stated, "I don't think Mike [Pulice] should get railroaded over this. He knew there was a problem, he was trying to deal with it, she [evidence custodian] was aware that she was under investigation. You may say that she didn't -- wasn't, but I've been told that she was aware of it. I spend a lot of time with the cops. I know them pretty well... I think it's wrong that we would railroad a man who has given 22 years of his life to the City. Yeah, he's made some mistakes. Welcome to the human race. "

138.    The Fairbanks City Council in 1996 and 1997 was trying to put out one fire after another in the FPD caused by inept management, poor leadership, financial malfeasance, nepotism, sexual misconduct, and rampant corruption.

139.    The mayor at the time, James Hayes, later was convicted of several federal felony crimes of dishonesty and was sentenced to 66 months in federal prison.

140.    Pulice once admitted to the City Council that he operated in a gray area.

141.    The City encouraged him to continue operating in a gray area.

142.    One of the gray areas in which Pulice operated was to threaten to frame or entrap people for crimes they did not commit.

143.    Pulice told attorney Brett Wood that he was an expert in entrapment and had "set up" people during a conversation where he attempted to discourage

public safety employees Jimmy Rice and Lee DeSpain from pursuing claims against the City.[1]

144. In 1997, the City and FPD were being run by a Mayor who was later convicted of stealing money from his church, and a police chief who eventually cost the City $1,600,000 for threatening to frame whistleblowers who had accused him of serious crimes.

145. Against this backdrop of rampant corruption, intimidation, and coercion, perpetrated and endorsed at the highest levels of city government, John Hartman was murdered.

146. The City used the Hartman murder to divert the public's attention away from the various scandals enveloping city government. The police department was under enormous pressure to make an arrest and secure a conviction, by any means available.

147. Former Anchorage Police Chief, and former State Commissioner of the Department of Public Safety, Ronald Otte has recognized that FPD's case against Marvin was grievously flawed and he wrote an op-ed piece for the Alaska Dispatch News. Otte stated, "The rush to judgment by police investigators created a tunnel vision focus that, at times, resulted in sloppy and questionable police conduct.... What we have learned in the years since the murder of a 15-year-old boy is that process and justice are probably not one and the same, at least not in this case. Justice for John Hartman and of the Fairbanks Four requires the commitment

---

[1] See City of Fairbanks v. Rice, 20 P.3d 1097 (Alaska 2000).

and courage to acknowledge mistakes and the resolve to find the truth. The only outcome worse than not solving a murder is convicting the wrong person while the real killer goes free."

148. As to how FPD handled their star witness, Arlo Olson, Otte stated, "the disgraceful way [Olson] was threatened, pressured and coached to give an eyewitness account that all involved should have known was not true is a reflection on the integrity of the entire investigation and prosecution."

149. FPD Chief Randall Aragon was forced to resign in 2016 after it was discovered that he had refused to allow the FPD to provide security services to local businesses and instead told the businesses they had to pay him through his private security company.

150. The City lacks both the courage to acknowledge mistakes and the resolve to find the truth.

151. The City will never have the courage to admit mistakes or the resolve to find the truth unless and until it is held accountable for what it did to Marvin.

152. Ring and Geier had a widespread practice of targeting and bullying Native youth.

153. Other individual Native Alaskans have had their constitutional rights violated by the FPD in the same way that Marvin has.

154. FPD routinely discriminates against Native Alaskans.

155. At the time of events giving rise to this case, there was an especially high degree of racial tension between the Alaska Native community and the City.

156.   The Alaska Native community has always known that Marvin is innocent and has worked tirelessly to help him in any way that it can.

157.   The Alaska Native community sees this case as a prime example of racial bias within FPD.

## CAUSES OF ACTION

### Violation of right not to be deprived of liberty as a result of the fabrication of evidence, right to fair trial, and right not to be deprived of liberty without due process of law under 42 U.S.C. § 1983

158.   Defendant police officers, acting individually and in concert, deliberately coerced false testimony out of witnesses.

159.   Defendant police officers, acting individually and in concert, reported information they knew to be false.

160.   Defendant police officers deprived Marvin of his clearly established rights under the Fourth and Fourteenth Amendments to not be deprived of liberty as a result of the fabrication of evidence by police, to have a fair trial, to not be deprived of liberty without due process of law, and to have FPD conduct a reasonable investigation.

161.   Defendant police officers acted under color of state law, deliberately, intentionally, or with reckless disregard for the truth.

162.   No reasonable officer at the time would have believed that the officers' conduct was lawful.

163.    All facts are incorporated here, including the following. Ring, Geier, Kendrick and Doe defendants manufactured false witness testimony, especially the testimony of Olson. FPD defendants then reported information they knew to be false, such as Olson reporting that the car involved in the attack on Dayton was blue and that he could positive identify Marvin as having participated in the assault of Dayton. Olson had no knowledge of those facts until FPD fed them to him and then coerced him into testifying that they were true.

164.    Ring and/or Doe defendants turned off tape recorders during exculpatory testimony from witnesses, withheld exculpatory evidence, and refused to consider any alternate suspects.

165.    As a direct and proximate result of the defendants' actions, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

## Malicious Prosecution under 42 U.S.C. § 1983

166.    Defendant police officers, acting individually and in concert, with malice and knowing that probable cause did not exist, caused Marvin to be arrested, charged, and prosecuted.

167.    Defendant police officers violated Marvin's clearly established right under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure and to be free from prolonged detention.

168.    Defendant police officers acted under color of state law, deliberately, intentionally, or with reckless disregard for the truth.

169.   No reasonable officer at the time would have believed that the officers' conduct was lawful.

170.   All facts are incorporated here, including the following. Ring, Geier, and Doe defendants manufactured false witness testimony that directly resulted in Marvin's conviction while simultaneously turning off tape recorders during exculpatory testimony, withholding exculpatory evidence, refusing to investigate any alternate suspects, and threatening defense witnesses.

171.   As a direct and proximate result of the defendants' actions, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

## Deprivation of constitutional right of access to court and affirmative obligation to come forward with exculpatory evidence under 42 U.S.C. § 1983 and *Tatum v. Moody*[2]

172.   All defendants possessed evidence that demonstrated Marvin's innocence and had an affirmative duty to come forward with that evidence beginning during the initial investigation in 1997 and continuing at least until he was exonerated in 2015.

173.   Defendant supervisors were on notice of the concealment of exculpatory evidence, were recklessly indifferent to the failure to disclose exculpatory evidence, and had a custom and practice of depriving defendants of information that would prove their innocence.

---

[2] 768 F.3d 806 (9th Cir. 2014).

174.    Defendants violated Marvin's clearly established rights under the First and Fourteenth Amendments.

175.    Defendant police officers and supervisors acted under color of state law, deliberately, intentionally, or with reckless disregard for the truth.

176.    No reasonable officer at the time would have believed that the officers' conduct was lawful.

177.    All facts are incorporated here, including the following. All FPD defendants even remotely connected to this case were aware of every detail of the case due to the extreme amount of political pressure and press coverage the case received when it was being investigated and prosecuted. All FPD defendants had knowledge that was exculpatory and was concealed. Ring knew Olson's testimony was false. Doe supervisors supervised Ring, had notice of both his history of constitutional violations and of his actions in this case including coercing false testimony out of Olson, had the opportunity to intervene by correcting the investigation before Marvin was convicted, and failed to do so. Geier and Doe supervisors knew of Holmes' admission in 2011 and knew Nolan was refusing to follow up on the admission or disclose the information to Marvin. Supervisors could have interceded by disclosing the information to Marvin or assigning another officer and failed to do so. Doe defendants concealed Davidson's statement, Ring and/or Doe defendants concealed Stone's interview, Nolan and Geier and Doe defendants concealed Holmes' 2011 admission, and the City obfuscated Marvin's efforts to get the exculpatory boot print analyses evidence. All of this evidence should have been

produced. These actions were so consistent and pervasive they were clearly condoned by Doe supervisors.

178.   As a direct and proximate result of the defendants' actions, Marvin was wrongfully convicted and imprisoned for 18 years, causing him injury and damages.

## Engaging in conduct that shocks the conscience of the court under 42 U.S.C. § 1983

179.   Defendants' deliberate efforts to manufacture evidence that would convict an innocent man shock the conscience and violate Marvin's clearly established right to substantive due process under the Fourteenth Amendment.

180.   All facts are incorporated here, including Ring forcing Olson to testify to information he knew to be false in order to convict four Native Alaskan teenagers that the defendants knew to be innocent, and then having Geier, Nolan, and Doe defendants hide new evidence that revealed the true murderers while Marvin suffered in prison for 18 years.

181.   As a direct and proximate result of the defendants' actions, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

## Supervisory liability under 42 U.S.C. § 1983

182.   Defendant supervisors knew or were deliberately indifferent, reckless, or grossly negligent as to the violations of Marvin's clearly established constitutional rights by FPD officers.

183.    Individual FPD officers acted in an environment where they were not trained, supervised, or disciplined.

184.    Individual FPD officers acted in an environment where their violations of Marvin's constitutional rights and the constitutional rights of others were condoned by defendant supervisors.

185.    The individual FPD officers committed constitutional violations with the approval and acceptance of supervisors in this and other cases.

186.    Supervisors had opportunities to intercede on Marvin's behalf but failed to do so.

187.    All facts are incorporated here, including the pervasive nature of racial animus, discrimination, racial profiling, and constitutional violations in the Fairbanks Police Department, the scandals involving Pulice, Aragon and Hayes, Ring and the other FPD defendants intentionally convicting Marvin of crimes he did not commit, and the decades-long pattern of hiding exculpatory evidence that would have freed Marvin by Nolan, Geier, the City, and Doe supervisors. The pervasive and consistent nature of this conduct makes clear that it could not have occurred without supervisory approval and/or involvement.

188.    As a direct and proximate result of the defendants' actions Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

## Civil rights conspiracy claim under 42 U.S.C. § 1983

189.   Acting in concert, defendants agreed among themselves and with other individuals to deprive Marvin of his clearly established constitutional rights.

190.   All facts are incorporated here, including the scandals involving Pulice, Aragon and Hayes, the decades-long effort to convict Marvin of crimes he did not commit starting with Ring, Kendrick, Geier, and Doe defendants in 1997, continuing through Doe defendants, Geier, and Nolan while Marvin was incarcerated, culminating with the City refusing to disclose the evidence he needed to prove his innocence, and then the State forcing him to sign the release dismissal agreement under extreme duress. It would have been impossible for the defendants to have successfully convicted a demonstrably innocent man and suppressed all evidence that could exonerate him so effectively without Ring, Geier, Kendrick, Nolan, the City, and Doe defendants agreeing to act in concert.

191.   As a direct and proximate result of the defendants' decades long effort to keep Marvin in prison for decades for crimes he did not commit, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

## 42 U.S.C. § 1985 (3) Conspiracy

192.   Defendants were motivated by racial animus and agreed among themselves to act in concert to deprive Marvin of the equal protection of the laws.

193.   Defendants had a history of targeting Alaska Natives.

194.    All facts are incorporated here, including the history of Geier and Ring of targeting Alaskan Natives, the larger percentage of Alaska Natives incarcerated by the criminal justice system, the decades-long effort to convict Marvin of crimes he did not commit starting with Ring, Kendrick, Geier, and Doe defendants in 1997, continuing through Doe defendants, Geier, and Nolan while Marvin was incarcerated, culminating with the City refusing to disclose the evidence he needed to prove his innocence, and then the State forcing him to sign the release dismissal agreement under extreme duress. It would have been impossible for the defendants to have successfully convicted a demonstrably innocent man and suppressing all evidence that could exonerate him so effectively without Ring, Geier, Nolan, the City, and Doe defendants agreeing to act in concert motivated by racial animus.

## Claim against the City of Fairbanks under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*[3]

195.    The City and the FPD, by and through their final policy makers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning constitutional violations like the violations described in this case. The City and the FPD policymakers were deliberately indifferent to the known and obvious risk that their policy, custom, or practice would lead to Marvin and other Native Alaskans being wrongfully convicted.

196.    The City and the FPD had actual or constructive notice of constitutional violations and failed to investigate, train, supervise, or discipline FPD officers.

---

[3] 436 U.S. 658, 98 S. Ct. 2018 (1978).

197.   All facts are incorporated here, including the following. There was immense public interest in this case, non-stop media coverage, and intense pressure on the City and FPD to convict someone. All the defendants would have been aware of every development in this case for its entire, tortured history. Geier and Ring had a long history of targeting and profiling Alaska Natives. Scandals involving Pulice, Aragon, and Hayes show that the FPD has been infected with misconduct at its very highest level for decades. The other Native Alaskans who have had their constitutional rights violated in similar circumstances show that Marvin's case is all too common. The decades-long effort to convict Marvin of crimes he did not commit starting with Ring, Kendrick, Geier and Doe defendants in 1997, continuing through Doe defendants, Geier, and Nolan while Marvin was incarcerated, culminating with the City refusing to disclose the evidence he needed to prove his innocence, and then coercing him to sign the release dismissal agreement under extreme duress, is clear evidence that violating the constitutional rights of Native Alaskans has become the policy or custom of the FPD.

198.   As a direct and proximate result of the defendants' misconduct, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

**Violation of right to access the courts under 42 U.S.C. § 1983 and the Alaska Constitution**

199.    The defendants impeded Marvin's constitutional right to access the court by coercing him to sign the release dismissal agreement in violation of both the U.S. and Alaska Constitutions.

200.    All facts are incorporated here, including the involuntary release dismissal agreement.

201.    As a direct and proximate result of the defendants' actions, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

**Violation of right to receive exculpatory information under 42 U.S.C. § 1983 and *Brady v. Maryland*[4]**

202.    Marvin had a clearly established right to disclosure of all evidence that might exonerate him prior to his trial and at all times between his trial and his ultimate exoneration in 2015.

203.    The City and the FPD defendants violated that right by withholding exculpatory evidence.

204.    All facts are incorporated here, including the following. Ring and Doe defendants withheld Olson's true testimony that the attackers drove a beige car and that he could not identify who they were. Ring, Geier, and Kendrick intentionally failed to record portions their interrogations of Vent and other witnesses. Geier and/or Ring and/or Doe defendants intentionally withheld the statements of Goebel

---

[4] 373 U.S. 83 (1963).

and Stone. Doe defendants withheld Davidson's statement. Nolan and Geier and Doe defendants withheld Holmes' confession. Doe defendants withheld Stern's statement. The City withheld the evidence needed to perform a complete boot impression analysis. All this evidence would have led to Marvin's exoneration.

205.   As a direct and proximate result of the defendants' actions, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

## Spoliation of evidence under Alaska law

206.   The defendants intentionally interfered with Marvin's prospective civil action by spoliation of evidence in violation of Alaska common law.

207.   All facts are incorporated here, including Ring and Doe defendants manufacturing false testimony and withholding exculpatory evidence; Geier, Nolan, and Doe defendants hiding the subsequent admissions in 2008 and 2011; and the City refusing to comply with the public information requests in 2013.

208.   As a direct and proximate result of the defendants' actions, Marvin was wrongfully convicted and imprisoned for 18 years causing him injury and damages.

## Negligence under Alaska law

209.   The defendants had a duty to Marvin, breached that duty, and that breach was a substantial factor in causing Marvin harm in violation of Alaska common law.

210.   All facts are incorporated here, including all the defendants convicting a man it knew to be innocent and refusing to disclose the evidence that would allow him to prove his innocence, resulting in damages.

## Intentional or Reckless Infliction of Emotional Distress under Alaska law

211.   The defendants engaged in extreme and outrageous conduct intentionally or recklessly causing severe emotional distress to Marvin in violation of Alaska common law.

212.   All facts are incorporated here, including the following. Ring and the other FPD defendants manufactured false testimony and withheld exculpatory information in order to convict Marvin of crimes it knew he did not commit. Geier, Nolan the other FPD defendants, and the City intentionally withheld exculpatory evidence to ensure that Marvin stayed in prison. Meanwhile the actual killers, who were known to the FPD, murdered at least three additional people.

213.   As a direct and proximate result of the defendants' actions Marvin was wrongfully convicted and imprisoned for 18 years causing him severe emotional distress, injury, and damages.

## REQUEST FOR RELIEF

A.      Declaratory judgment that the release-dismissal agreement is unenforceable.

B.      Trial by jury.

C.      Compensatory damages in an amount to be determined at trial.

D.      Punitive damages against all defendants other than the City.

E.      Pre-judgment and post-judgment interest.

F.      All costs including attorney fees under 42 U.S.C. § 1988 and any other applicable authority.

G.      Any other relief to which he may be entitled.

DATED at Fairbanks, Alaska, this ___ day of December 2017.

                                KRAMER and ASSOCIATES
                                Attorneys for Marvin Roberts


                        By _____
                                Michael C. Kramer
                                ABA #9605031